Before we start the running of the clock, Mr. Callahan, I do want to express concern about the confidentiality markings in the briefs, which seem to have marked things which are legal argument and which are things that we have to address in the opinion as being confidential. And I think it would be useful to go back, the two of you, and to see if you can eliminate a lot of those markings that relate to things which are argument and not confidential data that was included in the confidentiality markings in this report. MR. CALLAHAN We understand that, Your Honor. That is all Microsoft's confidential information. But we will go back with Microsoft and see if we can't get that truncated to absolutely only those things that would be necessary. MR. STEINWALD Yeah, that's something you should always do before you file a brief. So why don't you do that and then reduce that and file new briefs which eliminate as many of the confidentiality markings as is possible. MR. CALLAHAN Okay. MR. STEINWALD We'll do that, Your Honor. MR. STEINWALD Thank you. MR. CALLAHAN Good morning, Your Honor. May it please the Court. The District Court's opinion in this case contains two errors. One is as to the proper interpretation of the claims that are at issue in this case. The other is finding that there were no facts pursuant to which a jury looking at the properly constructed claims could find infringement. This Court reviews both of those decisions to no vote. First, the District Court's opinion wrongly interpreted the term pre-stored data derived to require a calculation of prices prior to a visitor visiting the website. Now there are a number of problems with that interpretation. First and foremost is that it is at odds with the plain and ordinary meaning of the claim language. There isn't any requirement in pre-stored data that requires that that data be priced in advance. The patentee... MS. STEINWALD You don't, you never, as far as I could tell, and especially in the Grave Reef, answer the question that the District Court basically put to you and that the Red Reef puts to you, which is how does it work if all of these calculations aren't done beforehand? How does your invention operate? MR. CALLAHAN Certainly, Your Honor. That's a good question. And how it operates... MS. STEINWALD I thought it was a good question when the District Judge posed it. MR. CALLAHAN Well, how it operates, Your Honor, is as follows. The advertiser, we've got a number of different parties here. The first part of it, before there's any or ever a visit to the website, is the advertiser, the person who wants to show me advertisements when I'm browsing the web. That advertiser has to do two things. First, in the Ad Center, or the advertisers do two things. They have to provide proposed bids for various different attributes. Now, the attributes can be things like keywords. MS. STEINWALD Yeah, I mean, we got that part. MR. CALLAHAN Okay. So that's the first thing they do. They say, this is what I will pay for each keyword. And they enter that in one place. MS. STEINWALD Right. And then, but you told the Patent Office that what was critical about your invention is that calculating those attributes and coming up with bids for those or prices for those was necessary before the customer visits. And if that conclusion of the District Court is not correct, then how does your invention work? Put aside Ad Center. MR. CALLAHAN There's two different things, Your Honor. There are combining attributes, which the patent does require. That is something that the patentee told the Patent Office was unique about its invention. In the prior art, the prior art systems, like Roth said, you advertiser have to sit down and you have to come up with every combination yourself in advance and say what amount of money you will bid for each attribute in each combination. Which our system says, all you have to do is tell us how you value each individual attribute before someone comes. We need to know how you value each attribute before someone comes. Then if you do that, the system has the ability to calculate the price for any particular combination of attributes, either before or after the visit, Your Honor. Obviously, there's some benefit, right, if we say I'm pricing these five different attributes and a visitor shows up and has three of those five. MR. STEINWALD Let me tell you what my problem is. In this earlier 436 prosecution, and you had the same examiner for all four of the patents, right? MR. CALLAHAN That's correct, Your Honor. MR. STEINWALD So if you look at 3208 of the appendix, it says that four of these claims distinctly define the key elements of the invention, which are, and then it says before, and they italicize before a visitor visits a website or other communications node, and then basically says combining the attributes and pricing them out. And I think your problem here is that having characterized the invention as having those two attributes at the time of the 436 prosecution, how is it that you can then later on turn around and say, well, the invention is something else? MR. CALLAHAN Well, what it's saying there, Your Honor, I believe, respectfully, is that the pre-visit, in that particular comment, it says each combination has a value which is determined from aggregating the value contributions. So they're saying if you place a price on each attribute, then each combination of attribute, whatever combination you make, is relatively easy to price. And you can price that before or after. It doesn't say that you have to price. It says by pricing each of the attributes, we know what the advertiser is willing to pay for any combination. JUDGE McANANY Well, let's suppose we disagree with you about the reading of the prosecution history. Let's suppose we say in the 436 patent, you characterized the invention as having these two characteristics, that is, the attribute and the pricing. Can I come in with that? Should that carry over to the later patent when the earlier prosecution characterized as, quote, the invention, as having these attributes? MR. CALLAHAN Well, I think, Your Honor, this Court's jurisprudence requires that if what Your Honor is asking is, is that a disclaimer or a disavowal of claims scope that carries forward. Certainly, prior prosecutions are informative, but I think whether it is in the actual prosecution of the patent in suit or one of its predecessors, predecessor patents, there needs to be a clear and unequivocal disavowal of claims scope. And I think that the section that Your Honor pointed to can be read either way. All it's saying is the same during prosecution, which is, if you price, if you provide a bid, or if you price each individual attribute, then it's a very simple thing, whether you do it before for  MR. STEINWALD You're reading the prosecution history differently than I do. I read the prosecution history in the 436 as saying that the key aspects of this invention were, before the visit to the website, spreading the attributes and pricing them. But, you know, I understand what your argument is, but assume that we reject that, just hypothetically, and that we say, well, that's the way the 436 invention was described. Now, the question is, does that carry over? MR. CALLAHAN I think, Your Honor, here it does not because of the specifically different claim language that is at issue. And particularly if we look at claim one, for example, the 364 patent, that entire claim, Your Honor, is concerned with what happens, according to the preamble, while a visitor is in contact with a communications node. So by its express language, it's saying the rest of what happens in this claim is concerned with what happens when the person shows up at the website. Even if it's true that the claim language is somewhat different, and even if it's true that you would not find, necessarily, a clear disclaimer or clear disavowal, in this case, it looked like the district court was pretty careful not to rely on that kind of analysis and simply to say, looking at the language here and the fact that there's nothing in there that's going to deter a visit, and then you go back and you have this confirmatory language in the prosecution history, all of that, the court ultimately said, supports its claim construction. The court didn't use the analysis that you find offensive. In other words, there's some straw men here that I think you've set up just so you could knock them down, but that's not what the district court did. MR. GOLDSTEIN Well, I think, Your Honor, what the district court, what this court's jurisprudence requires is one of two things. If we are going to define a term other than its plain and ordinary meaning, data, essentially, the district court said, where you say data, I am requiring that to be completed prices. And I think where the district court made a mistake is in neither finding a clear definition of the term, either pre-stored data or derived. Derived, in fact, isn't used anywhere in the specification of the patent. It appears only in the claims. So there is no definitional language that would limit pre-stored data derived, nor is there an unequivocal disavowal of claim scope. MS. MOSS Is there anything in the specification at all that describes the pre-stored data as being anything other than the kind of data that Judge Dyke pointed out, where the calculations are already done? MR. GOLDSTEIN Well, there is, Your Honor, disclosed, this would be at A-79, this is the 364 patent, column 9, lines 26 through 30, and then underneath that, there is a description of a real-time updated bidding system. So there's clearly a contemplation that the system can deal with things that are taking place in real-time. I think the most important issue here, though, Your Honor, is the language of the claims themselves, claim 1 of the 364 patent, for example, and then the language of claim 3, which does have a requirement that you calculate all of the prices. The patentee, both in claim 1 of the 364 patent and elsewhere, makes a clear distinction between when they're talking about bids, which is information that's coming from the advertiser, and data, which is things that you are manipulating in advance of someone coming to the website, and prices, which are a combination of whatever attributes are relevant to that visitor. So you could get 10 different visitors, each of whom has a different combination of the attributes that you've separately priced. It's not important to have calculated all those prices beforehand. You can do that when a particular individual with a unique set of attributes presents themselves at the website. What is important... I mean, because there's nothing in the specs that describes how that would be done after the fact. Your Honor, the specification describes, certainly describes how you price. It just doesn't say that it needs to be done beforehand. It can be done beforehand, and there are embodiments in the specification that say, calculate every single price of all the attributes that have been identified. But the claims don't require that, and there isn't anywhere, Your Honor, either in the specification or in the prosecution history that says you must calculate every price of every conceivable combination of all the attributes in advance. What the prosecution history says, Your Honor, is that you must separately price each attribute, so that when someone shows up with a combination of a particular set of attributes, you can quickly provide a price for that combination. The second thing, Your Honor, I'd like to turn to the point of what exactly it is the record shows about what the accused product does. And there, it's quite clear. In the accused product, the record that was before the district court, advertisers have to price both keywords, which is one kind of attribute, according to the patent specification, and then they have to provide what they call bid boosts or incremental prices for other attributes, things like the individual's gender, or the day of the week that they're visiting, or the location from which they're dialing up and getting access. They don't provide an aggregate price before the site visit, right? I'm sorry, Your Honor? They don't provide an aggregate price before the site visit. No, they don't provide any prices for anything other than individual attributes. And then the system, the Ad Center system then takes all of those keywords, each of which the advertiser has separately priced, and it populates all of the other attributes that the advertiser has agreed to pay incrementally more for, maybe five cents extra if it's a man, three cents extra if it's a woman, et cetera. And it creates a sort of a spreadsheet by keyword. Yeah, but it doesn't, within each keyword, it doesn't give you an aggregate price. No, it does not. It has within each keyword, so if the keyword is car, and you're willing to bid 50 cents for car, it has then underneath that how much extra I'm willing to pay for a man, how much willing I'm willing to pay for all the other different attributes, so that when someone shows up and says car, that's their keyword, you can go to all of the advertisers that have identified car as one attribute, and then figure out what combination of other attributes that unique visitor presents, and figure out what the best price is for the delivery of that ad, who, in other words, wins the bid. But you can see the Ad Center does not do that before the actual visit. You're saying it's easy to do it once the visit occurs, but they don't actually, it doesn't actually engage in that calculation before a visit occurs. That's right, Your Honor, and the language, the repeated language in the prosecution history, particularly the language distinguishing the Roth reference. Roth says, Advertiser, I want you to sit down and think of every combination that you can imagine and fill them all out into a great big sheet, and then give them to us. The invention says, no need to do that. We don't need to, we don't need you, Advertiser, to combine all those things. You just tell us what each individual one is worth. We will do the combination, and then when someone presents themselves at the website, we can figure out what the best price is for that. So you have to, but you have to prevail on your claim construction argument as it relates to the issue of derivation or combination or pre-stored data in order for Adcenter to read on that, correct? That's it, Your Honor. Okay. We have to have this court determine that the district court erred by interpreting pre-stored data derived to mean determines all possible prices of all possible combinations before the advertiser, before the individual visits the website. I see I'm out of time, Your Honor. Thank you, Mr. Callahan. We'll give you two minutes for rebuttal. Mr. Hockman. Good morning, Your Honor. It's Rob Hockman on behalf of Microsoft. I want to just start with something Mr. Callahan just said left off. The district court never said that the system, the pre-stored data derived should be construed to mean that all possible combinations need to be built out prior to the visit. In fact, there was a claim construction dispute about that, and it's the claim construction order that's attached to, I believe, to the back of the brief. The opening brief. The district court actually said, no, it doesn't have to be. We asked for that. We didn't get that interpretation. Instead, she said, they argued it just needs to be one. We argued it needs to be all. She didn't have to say how many. She just said it's not more than one. It's not all. It's some number. Some multiple number. Let's start there. Then the other place I want to start, Judge O'Malley, with your question right at the     It doesn't work. It doesn't work. It doesn't work. It doesn't work. It doesn't work. It doesn't work. What he talked about was prices. He kept saying, well, it's easy to price, but what he left out was that with the advertisers submit these various attributes, there's mutually exclusive information there. You bid a certain amount for someone who's doing an Internet search on a weekday between 12 and 1 in the afternoon, and you do another price for someone who's doing an Internet search on a weekend between 9 and 10 in the morning. Maybe you've got one price for 20-year-olds. Maybe you've got another price for 30-year-olds. Nobody is both 20 and 30. The information that the advertisers provide is not a person, yet the visitor is a person. What the system does is the system takes that information and derives from that information sets of attributes that match real people, and it attaches at that point a price. The key thing is, if you only focus on price, you miss the fact that you can't attach a price to something that isn't potentially a real visitor. Isn't your propagation of data into the listing objects, isn't that enough of a combination or transformation to satisfy what the district court... No, because it's not a real person. The district court understood this. Because what gets propagated in Ad Center is you get a bunch of keywords, and then you have a bunch of these attributes. The listing object basically says, we'll take each keyword out and we'll create one listing object per keyword. Then it takes all of the attributes, 20s and 30s, someone in their 20s, someone in their 30s, someone searching on weekdays at noon, and someone searching on weekends at 9 a.m., and they all get moved into each keyword. It's still not a person. It's still not something that can have a price yet, and it is undisputed. There were requests to admit about this, there's no question. We don't build out anything that might be a real person until there's an actual visit. Could I understand what's going on here? If I understand correctly, at the time these patent applications were filed, that it wasn't practical in real time to do the computation, because it would take too long and the person who visited the site wouldn't wait that long to get to the client. That's exactly what the inventor said. Do we now have a situation as a result of increased computer capacity that it's now possible under the Microsoft approach to make the computation after the site visit? I think the answer to that question is it is now possible. Microsoft has figured out how to do that, but it's not simply because of computational power. It's totally different sets of algorithms. It's a different way of building out possibilities. It's a completely different way of taking that data and deriving the information that you want and need from it. The inventors had a way. They had their way, which was to take that data and build out before anybody does anything. That's the way you're going to save time, and he said that this is a 3210. It just couldn't be more clear about this. It can't work if you wait. It can't work if you wait, he said. That's this specification, and the specification carries forward. So, what he invented is something that can't work if you wait until the visit because what he's building, and it is the preferred environment, he's building a tree of a whole lot of different possibilities. Now, as I said at the outset, the district court's claim construction said there's a dispute about how many different possibilities, but I don't have to worry about that because Ad Center, Microsoft's engineers, found a different way, found something different to do, a different possible way of interpreting and manipulating the data that the advertisers provide. The real question is even if we accept the district court's claim construction, infringement is a question of fact, and shouldn't it have been a jury issue to determine whether or not Ad Center's activities read on what the district court described? No, I think not because what the district court describes again and what the district court recognized is that you need a set, before the visitor comes, some number of a set of attributes are already stored, pre-stored. That's what's been derived from the information. It's pre-stored and it's sitting there, and that attribute, some number of these sets of attributes could potentially match a real person. That's what's there and it has a price to it. As Judge Dyke pointed out, it is undisputed that Ad Center doesn't do that. It doesn't do that at all, not once. For any number of combinations, it doesn't happen at all and it's undisputed, so there's no way under this claim construction for a jury to find that there's infringement. But in order to reach the conclusion that this pre-stored data has to match a real person, then are you relying on a prosecution history disclaimer? No, no. In fact, I think that it supports, first of all, we're not relying on a prosecution history for a disclaimer of anything. What we're trying to do is interpret the phrase pre-stored data derived. In fact, what we're really trying to do is interpret Claim 1 of the 364 patent. If you just look at it, forget about the prosecution history, forget about the earlier patent, just look at Claim 1. What's going to happen in Claim 1 is clear. At some point, you're going to have to find the greatest overall price that matches a potential visitor. That's what it says in Claim 1. But you've got a problem because the dependent claims seem to suggest that that's not an attribute of Claim 1. So I think without the prosecution disclaimer or whatever you want to call it, reading the Well, let's look at the claim differentiation arguments, Claims 3 and 4. And if you pull it, this is at A85. So I think if there's no question in my mind that at some point under Claim 1, you have to be able to come up with the bid that is the greatest overall price that matches the profile of a visitor. In other words, a real person, just what we've been talking about before. Now Claim 3 says where Part B comprises access to pre-stored data for each bid of the plurality. If you go back up to Part B of Claim 1, the pre-stored data derived from A plurality of pre-collected bids. So let's start with what's going on. And this goes back to what Mr. Callahan said. You start with advertisers. Advertisers submit bids. Those bids include a variety of different possible combinations that match real people. So the first question is, does the claim require that you build out something for every single bid? And as I said at the beginning, the district court said, maybe, maybe not, I don't have to reach that. I understand that, but why does that help you? Because Claim 3 says now for each bid. So every bid that comes in.  Of the plurality of bids. In other words, so imagine you have three advertisers. Advertiser A, B, and C. Under Claim 1, possibly, you could just build out bids from, you could build out some combinations from Advertisers A and B and you leave off C. Maybe C is already over budget. And that's the first question you ask. Has C already exhausted their advertising budget? So if C has exhausted the advertising budget, we're going to save time. We're not going to build out anything for them. Right? So maybe you do that, but Claim 3 says, nope, you can't do that. You do it for everyone. Claim 4 then says, you build out for each of the bids, all of the possible combinations. And again, maybe you don't have to build out every single possible combination. The district court recognized that, but Claim 4, you do. And here's the other thing, Judge Dyke, I think that I really want to emphasize about the claim differentiation argument. They aren't saying, they can't say that building out these and deriving from the information you get from Advertisers, the set of attributes that look like a real person, they can't say that doesn't happen at all because it has to happen in their claim. You can't get a price without something that looks like a person. So if you take their Claim 3 and 4 seriously, what they say in their reply brief is that, and it's the first time, Judge O'Malley, first time they said anywhere in this patent, what doesn't, they say the word identify doesn't. That's what they say in their reply brief. But then in Claim 3 and 4, on their view, the dependent claim takes what happened in identify, changes the meaning of identify, because now it's already been done in a different part of the claim. That's not claim differentiation. That's not what a dependent claim does. A dependent claim can't change the meaning of a claim term in the independent claim. So you have to look at it this way. It has to be about how much of the information is built out. Otherwise, it just doesn't fold together. I do think, by the way, the prosecution history is pretty devastating. Also, the fact that the specification, nowhere ever gives any hints. When you put them together, you get this. The inventor basically said, I don't know how to do this at the time of the click. Then in the specification, it never shows how you take the information and derive a real person after the click. It even goes through, this is columns 19 and 20, it goes through certain proposed optimizations. It never suggests in any of these optimizations that one way to do it differently would be to build out these real person attributes, sets of attributes, after the click. So there's nothing. There's nothing to support their interpretation. The word derived works. The logical processing that's involved in creating a potential real person from the mutually exclusive set of attributes is a very natural fit for derived. Pre-stored data sounds a lot like what the specification refers to as the matching tree, which is at column 10, lines 19 and 20, referred to as a memory cache structure. In other words, everything works pretty easily. Prosecution history, the specification, the claim language all works together on our and the district court's interpretation, and nothing works on theirs. If there are no further questions, Your Honor, we ask that you affirm. Thank you, Mr. Hamilton. Mr. Callahan, you have two minutes. Your Honor, several points. One, the initial citation of the prosecution history that they think, while they think it's devastating, they're not relying on it for disclaimer. I think that's a very important admission. 83210 was the citation counsel gave you. In both of the discussions of the prior art there, the distinction is made as to the claims that were presently at issue, and that is a theme that runs through a lot of their so-called prosecution disclaimer. The language here is, it sounds like, it's a lot alike, everything works. That is not this court's jurisprudence on claim construction. This court is looking for clear definitions. There is no argument that either of these terms were defined anywhere by the patentee, or clear disclaimers, clear and unequivocal disclaimers in the prosecution history. Counsel just told you they're not relying on the prosecution history for that. And there's not an issue in these claims about whether the price is being determined. In element C of claim one of the 364 patent, the price is clearly being determined. And he asks about whether there's a person present in these claims. Of course there is. Claim one, the very first element of claim one, the method comprising upon a visitor, that is a person visiting a communications note. So the patent describes how to do all these things as to whether it says you have to calculate the prices before or after. Claims one and three of the 364 patent demonstrate when read together, and claim three is directly dependent on claim one, and it's the only thing that it adds is it says calculate the prices in advance. So what we know, the only thing that claim three tells us is to calculate the prices in advance. We know about claim one, then, that you can't. Thank you, Mr. Callahan. Thank you very much, Your Honor. Thank both counsel in case it's submitted.